Anita M. WILSON, Administratrix of
the Estate of Patricia A. Wilson,
Deceased, Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. A. No. 85–551–N.

United States District Court,
E.D. Virginia,
Norfolk Division.

June 4, 1986.

## OPINION

WALTER E. HOFFMAN, Senior District Judge.

Plaintiff, Anita M. Wilson, in her fiduciary capacity, seeks to recover damages from the United States for the death of the plaintiff's decedent, her mother, Patricia A. Wilson. The United States admits that the

treating physicians at the Navy Regional Medical Center in Portsmouth, Virginia, did not follow the applicable standards of care in the diagnosis, intervention, and treatment of cancer in Patricia A. Wilson. The plaintiff alleges that the United States physicians' negligence was the direct and proximate cause of the progression of the decedent's breast cancer and the development of the incurable metastatic disease which resulted in the January, 1985, death of Patricia A. Wilson.

## FACTS

In March 1976, Patricia A. Wilson consulted physicians at the Navy Regional Medical Center, complaining of a milky discharge from her right breast. A mammogram performed on March 26, 1976, showed abnormalities. The examining physician reported an indistinct area of firmness in the right breast. The physician treated Mrs. Wilson with antibiotics.

In June 1977, plaintiff's decedent returned to the gynecology clinic at the same medical facility. The examining physician noted a noduled and thickened area in the right breast, a pinhead sized lesion in the nipple, and a $6 \times 6 \times 6$ centimeter area of induration which was diagnosed as fibrocystic disease. Although the examiner recommended additional studies, no further studies were performed.

Leg pain sent Patricia Wilson back to the Navy Regional Medical Center in December 1979. Treating physicians did not encourage her to return to the gynecology clinic. In May 1982, Mrs. Wilson again came to the same facility complaining of left shoulder pain. Unimproved, she returned for treatment on July 7, 1982. Mrs. Wilson came to the clinic three more times in July 1982. In November 1982, x-rays revealed lytic lesions of the left scapula and right clavicle. The Navy Regional Medical Facility did not diagnose cancer.

In February 1983, Patricia A. Wilson entered DePaul Hospital where private physicians diagnosed metastatic breast cancer and immediately instituted a program of palliative care. Mrs. Wilson remained un-der the care of DePaul physicians until early 1984 when CHAMPUS rejected her claims, asserting that she had to be treated in a Naval facility. Intermittently, on inpatient and out-patient bases, Mrs. Wilson received treatment from the Navy Regional Medical Center thereafter. On January 18, 1985, Patricia A. Wilson died. Proximate cause has thus been clearly established as hereinafter discussed.

## DISCUSSION

Anita M. Wilson brings this cause of action pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2674; the court's jurisdiction is found in 28 U.S.C. § 1346(b). Under the Federal Tort Claims Act the United States is liable for personal injury or death caused by the negligent or wrongful act or omission of an employee of the government acting within the scope of his or her employment. The United States is liable in the same manner and to the same extent that a private person would be liable in accordance with the law of the place where the act or omission occurred. All of the acts at issue occurred in Virginia; therefore, Virginia law applies. The amount of damages will be calculated in accordance with the guidelines set forth in the Virginia Code § 8.01–52.

**Amount of damages.** The jury or the court, as the case may be, in any such action under § 8.01–50 may award such damages as to it may seem fair and just. The verdict or judgment of the court trying the case without a jury shall include, but may not be limited to, damages for the following:

1. Sorrow, mental anguish, and solace which may include society, companionship, comfort, guidance, kindly offices and advice of the decedent;

2. Compensation for reasonably expected loss of (i) income of the decedent and (ii) services, protection, care and assistance provided by the decedent;

3. Expenses for the care, treatment and hospitalization of the decedent incident to the injury resulting in death;

4. Reasonable funeral expenses....

The punitive damages provision of Virginia Code § 8.01–52 is disallowed by 28 U.S.C. § 2674. No punitive damages will be awarded in this case. *Wilson v. Whittaker*, 207 Va. 1032, 154 S.E.2d 124 (1967).

In response to the plaintiff's Request for Admissions, the United States has admitted that the Navy Regional Medical Center did not follow the applicable standard of care in the diagnosis and treatment of Patricia A. Wilson. Consequently, this court is called upon to decide only two issues: proximate cause and the amount of plaintiff's damages.

■ An expert witness, Dr. James J. Stark, a medical oncologist, reviewed the decedent's medical records. Dr. Stark testified that Patricia A. Wilson should have undergone a modified radical mastectomy in 1977, at which time the cancer was small enough to have been classified as Stage I, indicating no distant spreading and no lymph node involvement. Dr. Stark testified that a patient whose cancer is detected and removed at Stage I has an 80 to 85 to 90% chance of survival. Based upon a reasonable degree of medical certainty, Dr. Stark testified that the Navy Regional Medical Center's breach of the applicable standard care was the proximate cause of the death of Patricia A. Wilson. The medical facility's failure to detect the cancer caused its growth, division, multiplication, and spread, all of which proximately caused the patient's death. Based upon Dr. Stark's uncontroverted testimony, the court finds that the negligence of the United States proximately caused the death of Patricia A. Wilson.

Fully recognizing that no monetary award can ever fully compensate children for the loss of their mother, the court now considers the issue of damages. Following Virginia Code § 8.01–52, the court first awards to the plaintiff the sum of $3,682.06, the actual amount of the decedent's funeral expenses. Additionally, the court awards $10,408.38 to compensate the plaintiff for decedent's medical expenses not previously paid by CHAMPUS. For the sorrow, mental anguish, and solace which the plaintiff and her brother suffered as a consequence of the mother's lingering illness and death and for the loss of the mother's companionship, comfort, guidance, and advice, the court awards the total sum of $160,000. The husband of Patricia A. Wilson died of natural causes after Mrs. Wilson's death and, even though he was an eligible beneficiary at the time of her death, the children named herein are his beneficiaries.

The difficult question in the assessment of damages in this case is, as stated in § 8.01–52 of the Code of Virginia, for the compensation for *reasonably expected* loss of (i) income of the decedent and (ii) services, protection, care and assistance provided by the decedent. Other than what is provided for under sorrow, mental anguish, and solace, it is proper to disregard any issue of services, protection, care and assistance provided by Mrs. Wilson for her daughter (now age 25), and her son (now age 23), for the period after her death. However, the daughter lived with her mother and father; and while the children attended college, the parents provided financial help to both children. The evidence discloses that when the children needed money for a particular purpose, there was always a fund available for them to take same. To some extent it may be properly assumed that the daughter was actually partially dependent upon the mother for the last two-plus years of her life, i.e., from 1982 to 1985, especially while attending college. It does not follow, however, that a full recovery may be claimed for lost wages during Mrs. Wilson's lifetime for such period as she was unable to work and was no longer employed. Conceding that Mrs. Wilson probably would have been able to work between November, 1982 (when she relinquished her job due to her health) and January 18, 1985 (when she passed away), if she had received proper medical attention in 1977, and roughly computing what her loss of income from her employment would have been at $32,860.10, the present action under the Virginia Wrongful Death Act does not permit an award to the

decedent's estate, or to her beneficiaries, for her loss of earnings. As the statute, Virginia Code § 8.01–52, provides, it is "compensation for the *reasonably expected* loss of income of the decedent" which is included as an element of damage. The words "reasonably expected" must clearly refer to the beneficiaries; assuredly, a decedent cannot "reasonably" expect the loss of earnings after she has passed away. Moreover, the statute makes no distinction between income lost prior to death and that which the decedent would have probably earned over a normal work-life expectancy period.[1]

The foregoing does not mean that, if a *debt* was owed by a tortfeasor defendant to a decedent, the plaintiff, in her personal representative capacity, could not recover for that debt, as well as any recovery under the Virginia Wrongful Death Act. However, the recovery for any such *debt* would not be for the benefit of the beneficiaries, but would be for the benefit of the decedent's creditors, if any, and, if all creditors had been paid, the beneficiaries would receive the proceeds as distributees of the decedent's estate, assuming that no will existed. This is evidenced by the drafting of § 8.01–52 which, under paragraphs numbered 3 and 4, provide for the recovery of "Expenses for the care, treatment and hospitalization of the decedent incident to the injury resulting in death" (paragraph 3),[2] and "Reasonable funeral expenses" (paragraph 4).

In holding that punitive damages may not be recovered under the Virginia Wrongful Death Act, the Supreme Court of Virginia, in *Wilson v. Whittaker*, 207 Va. 1032, 154 S.E.2d 124 (1967), considered what was meant by damages which "may seem fair and just" (language also incorporated in § 8.01–52 of the Code of Virginia). Citing *Matthews v. Hicks*, 197 Va. 112, 87 S.E.2d 629 (1955) (where the surviving wife had deserted the decedent and lived in adultery for two years, but returned to him over weekends about two weeks before his death), the Court determined that it was "fair and just" to permit evidence of these facts as the surviving spouse was a beneficiary under the statute. Granting that the words "fair and just" are entitled to a broad and liberal construction, *Matthews v. Warner*, 29 Grat. 570, 573, 70 Va. 570, the Court held that damages may be awarded *for the pecuniary loss sustained by the statutory beneficiaries*, together with the loss of decedent's care, attention and society, as well as "such sum as the jury may deem fair and just as solatium to the beneficiaries for their sorrow and mental anguish caused by the death."

■ We conclude, therefore, that the "reasonably expected" loss of decedent's income means such loss as the beneficiaries have suffered, or may suffer, and the fact that Mrs. Wilson may have earned slightly more than $32,000 had she been able to work between November, 1982, and January, 1985, is immaterial, except for the purpose of determining what portion of this amount would have been "reasonably expected" by the beneficiaries.

In ascertaining what pecuniary loss would have been "reasonably expected" for

---

1. We make this observation because, as we understood the argument of plaintiff's counsel, the income lost between the date of Mrs. Wilson's last employment check in April, 1983, and the date of her death on January 18, 1985, was automatically a loss to be included in plaintiff's total recovery, without regard to any "reasonable expected" figure. As noted, the Court has determined that there is a degree of what one beneficiary "reasonably expected" for the slightly more than two years Mrs. Wilson was not working.

2. These expenses, without contradiction, aggregate $10,408.38 (the amount over and above what CHAMPUS paid). Section 8.01–52 directs that "Damages recoverable under 3 and 4 above shall be apportioned among the creditors who rendered such services, as their respective interests may appear." Plaintiff introduced in evidence the receipted funeral bill from Holloman-Brown Funeral Home, and may be considered an assignee of this claim, but receipted bills for the care, treatment and hospitalization of Mrs. Wilson are not in evidence. As the court must, under § 8.01–52, either apportion these claims, or be otherwise assured that such claims have been paid by the beneficiaries, these receipted bills must be presented at the time of entry of judgment.

the two years and two months the decedent was unemployed due to the condition of her health, the evidence is admittedly sparse.

The Wilson family was very close. The father retired from the Navy before his death in October, 1985. The amount of his retirement pay is not revealed by the record. A grandmother, afflicted with diabetes and required to take insulin, lived with the family until her death in October, 1984. Anita, the daughter, lived with her parents at all pertinent times and, until February, 1983, she attended Old Dominion University with her parents paying all expenses. With her father and mother each ill with cancer, she was required to drop out of Old Dominion University in February, 1983, but she obviously reentered college in the fall of the year as she graduated from Old Dominion in December, 1983. The son, William, was also an Old Dominion student at the time his mother stopped working in November, 1982. At about that time, or shortly thereafter, the son dropped out of college and apparently has never returned although he has expressed the desire to complete his college education. At the time of trial he was employed as an exporting agent, but had held down several different jobs since he left college. When his mother resigned from her employment in November, 1982, the son was living at home, but either before or after he stopped going to college he lived outside the family home, thus placing a greater burden upon his sister to care for the parents and grandmother.[3]

◼ The law in Virginia is that a beneficiary under the Virginia Wrongful Death Act need *not* be a dependent, nor a minor child.[4] The issue turns on what amount, if any, the two beneficiaries could have "reasonably expected," regarding any loss of income from the mother's earnings. Other than the cost of maintaining the household expenses in their entirety from whatever retirement benefit the father received, along with Mrs. Wilson's income (or such

income as may have been reasonably anticipated after she resigned from her employment in November, 1982), we have little to go on except the knowledge that the college expenses were paid by the parents. We are without the benefit of the father's testimony because he died in October, 1985, a few months after Mrs. Wilson died. Nor is it proper for the Court to consider any reasonable expectation of inheritance from Mrs. Wilson's estate after her death. In *Porter v. Virginia Electric & Power Co.*, 183 Va. 108, 31 S.E.2d 337 (1944), the Court said:

> The wrongdoer is not required to contribute to others than those mentioned in the statute. He is not required to contribute to the estate of the deceased. The classes of beneficiaries described in the statute are exclusive. Other classes or persons cannot be added by judicial construction.

*See also, Conrad v. Thompson,* 195 Va. 714, 80 S.E.2d 561 (1954); *Cassady v. Martin,* 220 Va. 1093, 266 S.E.2d 104 (1980). While, as of the date of her death, her two children were undoubtedly the natural objects of any future inheritance, it would be highly speculative under Virginia law to hold that the two beneficiaries here involved could reasonably expect an accumulation of income tantamount to an estate to be left to them by Mrs. Wilson during what would have been her working-life expectancy, plus the fact that Mrs. Wilson was not required by law to leave her children anything by will.

Mrs. Wilson reached the age of 50 on June 25, 1984. Her medical record discloses that, as of February 12, 1983, she advised her physician that she had been smoking a pack and one-half of cigarettes each day for 20 years, but there is no affirmative statement to the effect that her cancer was the result of smoking. Her life expectancy in 1977, at which time the defendant should have determined that she

---

3. This would be noted especially but for the fact that the beneficiaries are in agreement that any recovery should be evenly divided.

4. Dependency is not a prerequisite. *Marshall v. Goughnour,* 221 Va. 265, 269 S.E.2d 801 (1980).

had cancer, was 36.2 years. Her life expectancy at the time of her death was 29.1 years. *See:* Section 8.01–419, Code of Virginia. Her working-life expectancy at the time of her death was slightly in excess of 14 years. Her gross earnings for the last full year of employment (1982) prior to her death were $14,898.70. She was paid for her full-time employment through November 4, 1982 but, due to accrued sick and annual leave, she actually received her salary through April 7, 1983. She served as the head teller for the Navy PWC Norva Federal Credit Union, and also did work as an insurance clerk in handling member death and disability claims. When the manager and assistant manager of the Credit Union were absent, she also occasionally approved loans. She became employed by the Credit Union in 1971 and her first full year as an employee was 1972 when her earnings were $4,152.00. Her salary had increased steadily during the periods of inflation. The location of her employment was at Building A–81, Naval Station, Norfolk, Virginia. The reason for leaving her employment was due to permanent disability. It is reasonable to assume that she would have earned at least $15,000 per annum (and probably more) during the balance of her working-life expectancy. However, even if we were to consider these earnings for a period of slightly more than 14 years, we must consider her living expenses during this time.[5] With her earnings at approximately $15,000 per annum, it is highly unlikely that she would have any appreciable excess over and above her normal living costs but, as indicated, we have no available estimates as to her cost of living, including the maintenance of any home.

■ Since Mrs. Wilson was living when the daughter graduated from Old Dominion University in December, 1983, and the evidence shows that all expenses for her education had been paid by the parents, the loss to the daughter between February, 1983, when she dropped out of college, until the mother's death in January, 1985, is essentially a loss of the daughter's earning capacity due to the fact that she could have secured employment but for the illness of her mother, father and grandmother. Adopting the "fair and just" rule as being entitled to a broad and liberal construction, *supra,* the Court fixes this figure at $5,000.00 confined to the mother's illness and the daughter's reasonable expectancy that, had her mother been in reasonably good health, the mother would have cared for her father and grandmother.

On the contrary, there is no reasonable expectancy that the son had any pecuniary loss between the time he dropped out of college and left the family home. While he expressed a desire to complete his college education, he has made no effort to again enroll as a student, nor did he live with his parents after leaving college. He has been working, with some degree of continuity, at some employment since that time. There is no evidence of reasonable expectancy of pecuniary loss occasioned by the mother's death, either for the period between February, 1983 and January, 1985, or for the working-life expectancy of the mother after January, 1985. It may be argued that the son would have completed Old Dominion had his mother not entered the hospital in February, 1983, but, in that event, the court would have to know the son's earnings received from February, 1983 to January, 1985, in order to evaluate, if possible, the pecuniary loss, if any, to the son.

For the period subsequent to January, 1985, the Court holds that, as contrasted with the sorrow, mental anguish and solace, there is no justification to find that the two children "reasonably expected" any loss of (i) income of the decedent and (ii) services, protection, care and assistance provided by Mrs. Wilson. If anything, the services, protection, care and assistance would have been provided by the children,

---

5. Plaintiff's counsel argue that only 25% of the total amount which would have been received during the working-life expectancy should be attributed to her cost of living. This percentage is ridiculously low.

as the mother had contracted cancer even though the disease could have been effectively treated but for the negligence of the defendant's hospital and staff.

Assuming that the two children still desire that there be an equal division of any recovery, the court makes the following aggregate awards for the joint benefit of William J. Wilson and Anita M. Wilson, the sole remaining beneficiaries of the decedent, Patricia Ann Wilson:

| | | |
|---|---|---|
| Funeral Expenses | - | $ 3,682.06 |
| Medical and hospital expenses | - | 10,408.38 |
| Sorrow, mental anguish, and solace | - | 160,000.00 |
| Reasonably expected loss (to Anita M. Wilson) of decedent's income for period prior to her death | - | 5,000.00 |
| Total Award | - | $179,090.44 |

Pursuant to the Federal Tort Claims Act, the court must set the amount of the attorneys' fees to be awarded out of, and deducted from, the stated recovery. The court reserves decision on this issue until counsel and the court confer, at which time the plaintiff and her brother should be present. Counsel are hereby requested to contact the court within fifteen days so that a final judgment may be entered in this case, and shall present to the court a statement of time spent in the investigation, preparation, and trial of this case.

The Clerk will forward copies of this opinion to counsel of record.